**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | **Chapter 7** |
| **Maria Angeles Liberatore,** | : | |
| **Debtor.** | : | **Case No. 11-16408 (JKF)** |
| **Roberta A. DeAngelis<br>United States Trustee,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| **Maria Angeles Liberatore,** | : | |
| **Defendant.** | : | **Adversary No. 12-0289** |

# <u>MEMORANDUM  OPINION</u>

BY:   Jean K. FitzSimon
        United States Bankruptcy Judge

## I.  INTRODUCTION

Plaintiff, Roberta A. DeAngelis, the United States Trustee ("UST), requests the

Court to deny the Debtor, Maria Angeles Liberatore (the "Debtor"), a discharge pursuant

to 11 U.S.C. § 727(a)(3).[1]  A trial of this matter was held over the course of two days on

---

[1]  The UST also seeks a denial of discharge pursuant to 11 U.S.C. § 727(a)(2);
(a)(4) and/or (a)(5).  Since the Court concludes that the Debtor must be denied a
discharge under subsection (a)(3), the other subsections of § 727 shall not be
discussed.  However, the evidence in the record supports a denial of discharge under
§ 727(a)(4)(A) as well.  The Debtor's original and amended Schedules and Statements
(continued...)

March 21, 2013 and March 25, 2013.  The trial established that the Debtor failed to list

several bank accounts on her original and amended Schedules or Statements of

Financial Affairs ("SOFA"), failed to list a transfer of property which occurred within the

one year period prior to her bankruptcy on her original or amended SOFA and made

numerous, sometimes very substantial cash withdrawals from her bank accounts for

which there is no documentation to evidence how the cash was used.  The Debtor

testified that she suffered from a prescription drug addiction prior to and after filing her

bankruptcy case but her testimony regarding her addiction, without more, fails to justify

her failure to maintain records. Therefore, upon consideration of the matter, the Debtor

shall be denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

## II.  BACKGROUND

***The Accident and the Debtor's***
***Prescription Drug Addiction***

In 1983, when the Debtor was sixteen, she suffered major injuries, including a

broken pelvis, multiple fractures, internal bleeding and facial fractures, as the result of a

car accident.  Hearing Transcript, 3/21/13 (HT 3/21"), at 108-09.  The accident

permanently affected her health.  She suffers from chronic pain, severe migraine

headaches and continuing orthopedic problems.  Id. at 109-110.  She obtains relief

from her pain, in part, from physical therapy, chiropractic treatments and myofascial

release procedures.  Id. at 49-50; 109–10.

---

[1](...continued)
of Financial Affairs contain numerous omissions which the Debtor was directed to
correct.  That never happened.  A debtor's reckless disregard to, or indifference for, the
truth supports a denial of discharge under § 727(a)(4)(A).  The Cadle Co v. Zofko, 380
B.R. 375, 384 (W.D. Pa. 2007).

For her migraine headaches, in particular, the Debtor was prescribed a prescription medication called Fiorinal.  Id. at 111.  However, when the migraines became too painful, she would go to the emergency room or to her physician's office at Broad Axe Family Medicine to receive an injection of Demerol.  Id. at 111-112.  When the Debtor was given Demerol at the ER or by her doctor, it was covered by insurance.  Id.  However, approximately six or seven years ago, the Debtor's health insurance provider stopped covering her medical care.  Id. at 110-111.  Consequently, for the past six or seven years, the Debtor has had to pay out-of-pocket for Demerol injections.  Id. at 112.

Over time, the Debtor alleges she became addicted to Demerol. Id. at 113. While she initially received Demerol injections approximately once a month to treat her pain, she started receiving injections of the medication on a weekly and then a daily basis.  Id.  Eventually, she needed the medication multiple times a day.  Id.  Once the Debtor developed her addiction, she was denied treatment at hospital emergency rooms because her medical problem (i.e., need for Demerol to dull her pain) had become a chronic problem.[2]  Id. at 44-45, 48.  Consequently, the Debtor obtained her Demerol injections from physicians at their offices or from physicians who were willing to make house calls for that purpose.  Id. at 113.  The physicians who primarily provided Demerol injections to the Debtor included the following: (I) Dr. Brian Keeley;

---

[2]  The Debtor testified that she "probably went to the hospital over 150 times" and was denied treatment.  HT 3/21/13 at 48.

(ii) Dr. David Greuner;[3] and (iii) Dr. Meade Barlow.

During the throes of her addiction, the Debtor moved temporarily from her townhouse in Blue Bell, Pennsylvania, to a small apartment which her husband owned in New York City.  Id. at 115.  This move to New York City made it easier for the Debtor to function with her addiction because, in New York City, she used taxicabs for transportation and, unlike her home in Blue Bell, the apartment in New York did not have stairs, which constituted a safety hazard when she was medicated.  Id.  The other advantage of living in New York City was that there were companies which specialized in providing physicians who made house calls to provide medical treatment and care. Id.  The physicians with these companies would provide the Debtor with Demerol injections.  The companies which the Debtor used included NYHouseCallDoctor, Premier House Call, Elite House Call and New York House Call.  Dr. Gruener was associated with Premier House Call.  While the Debtor would sometimes be charged "a couple of hundred dollars" for her injections, most of the time she was charged approximately $2,000 or more per house call.  Id. at 113.  When the Debtor was in pain and suffering from her addiction, she would pay whatever she was charged to be treated with Demerol.  Id..  When the Debtor required multiple Demerol injections in a single day, she spent thousands and thousands of dollars a month on her addiction.[4]

---

[3]  According to the Debtor she would sometimes need a Demerol injection when Dr. Greuner, who was a cardiovascular surgeon, was operating so he would have his girlfriend, Andrea Poulos, bring the Demerol to the Debtor and she would inject herself with it.  HT 3/21 at 52-53, 116-17.  Allegedly, Poulos would remain with the Debtor for the required time and take the Debtor's blood pressure before she left.  Id. at 117.

[4]  One of the Debtor's close friend, Mr. Henricks, testified at the trial, that in
(continued...)

4

The Debtor attended several addiction recovery programs but none of them were successful in helping her to overcome her addiction except for an inpatient addiction recovery program, which the Debtor finally attended in Arizona in February of 2013, at the Gallus Detox Centers.[5]  Id. at 114,162-63.  The Debtor also found a pain management doctor whom she trusts and who is willing to address her situation.  Id. at 53.

At the court hearing on March 21, 2013, the Debtor testified that she was not medicated and felt the "best" that she had in "four years."  Id. at 16, 114.   When she testified, she was coherent and articulate.

### Monetary Assistance from the Debtor's Sister and Friends

During the approximately 3½ year period when the Debtor alleges she was unable to work because of her drug dependency, she received $75,000 from her sister as well as numerous and sometimes very substantial sums of money from her long-time friend, Ed Henricks, whom she has known for 24 years.  HT 3/21 at 116, 136, 161-62; HT 3/25 at 6-7; see also Exhibit P-1, Document No. 1523 (showing $75,000 deposit

---

[4](...continued)
2008, when he returned to the United States after being overseas in China, he suspected that "there was something wrong [with the Debtor] related to a dependency issue[.]"  HT 3/25 at 42.  However, he was traveling quite extensively at the time so his "interaction with Maria was very sparse."  Id. at 42-43.  He testified that he did not know the magnitude of the Debtor's problem and continued advancing her money to help her with her living expenses until May of 2011, when he concluded that, in light of the Debtor's problem, he should not continue providing her with money. HT 3/25 at 43.

[5]  The Debtor testified that she had not participated in the Gallus Detox recovery program before February of 2013 because she had not known about it.  HT 3/21 at 162-63.  A friend, Warren Olsen, did extensive research and found it for her.  Id.

from the Debtor's sister into one of the Debtor's bank accounts).  The Debtor also received monetary assistance from a very good friend, Warren Olsen, who lives in Colorado.  Id. at 69 (referencing a $5,000 transfer from Olsen), 118, 146.

In February of 2010, the Debtor also received $100,000 from the sale of a property which she owned at 87 E. Butler Avenue in Ambler, Pennsylvania ("Butler Property").  See Exhibit P-1, Document No. 1517 (showing transfer of $100,000 into one of the Debtor's bank accounts).  The property was sold to an entity owned by the Debtor's sister and Mr. Henricks.  Additional details regarding this transfer are provided below.

***The Debtor's Payments for Medical Treatment***

Based on the documentary evidence provided at the trial, the Debtor paid thousands and thousands of dollars for medical care incident to her prescription drug addiction. The documentary evidence admitted at the trial shows that the Debtor paid for Demerol injections with her American Express credit card and checks.  The Debtor testified that she also paid for the injections with cash and, occasionally, by giving the doctors one or more of her personal possessions.  HT 3/21/13 at 82, 119.

For example, Debtor's American Express Statement for the 31 day billing period ending on 1/12/11 shows the following credit transactions for medical services in New York:

| 12/13/10 | $2,200 | Elite House Call |
| 12/13/10 | $2,200 | Elite House Call |
| 12/14/10 | $2,200 | Elite House Call |
| 12/15/10 | $675 | Elite House Call |
| 12/16/10 | $700 | Elite House Call |
| 12/18/10 | $800 | NYHouseCallDoctor |
| 12/20/10 | $700 | Elite House Call |

6

| | | |
|---|---|---|
| 12/21/10 | $475 | Elite House Call |
| 12/24/10 | $2,200 | Elite House Call |
| 12/26/10 | $700 | Elite House Call |
| 12/27/10 | $675 | Elite House Call |
| 12/30/10 | $700 | Elite House Call |
| 01/3/11 | $800 | New York House Call |
| 01/3/11 | $1350 | House Call |
| 01/4/11 | $2,200 | Elite House Call |
| **TOTAL:** | **$18,575** | |

Joint Exhibit 22.  Her American Express statement for the 28 day period ending on

2/9/11contains the following credit transactions for medical services in New York:

| | | |
|---|---|---|
| 1/26/11 | $800 | New York House Call |
| 1/26/11 | $13,900 | Premier House Call |
| 1/28/11 | $2,200 | Premier House Call |
| 2/2/10 | $3,100 | Premier House Call |
| 2/3/11 | $400 | NYHouseCallDoctor |
| 2/5/11 | $400 | Premier House Call |
| 2/3/11 | $2,200 | Premier House Call |
| 2/7/11 | $2,000 | Premier House Call |
| 2/8/11 | $800 | New York House Call |
| **TOTAL:** | **$25,800** | |

Id.  Similarly, the Debtor's American Express statement for the 30 day period ending

3/11/11 contains thousands of dollars for medical services in New York:

| | | |
|---|---|---|
| 2/9/11 | $700 | Premier House Call |
| 2/10/11 | $2,200 | Premier House Call |
| 2/11/11 | $2,200 | Premier House Call |
| 2/17/11 | $800 | NYHouseCallDoctor |
| 2/17/11 | $875 | Premier House Call |
| 2/18/11 | $3,000 | Premier House Call |
| 2/20/11 | $1,200 | Premier House Call |
| 2/20/11 | $3,000 | Premier House Call |
| 2/21/11 | $2,200 | Premier House Call |
| 2/21/11 | $2,600 | Premier House Call |
| 2/21/11 | $2,600 | Premier House Call |
| 2/22/11 | $2,200 | Premier House Call |
| 2/22/11 | $700 | Premier House Call |
| 2/23/11 | $2,200 | Premier House Call |
| 2/25/11 | $775 | Premier House Call |
| 2/25/11 | $775 | Premier House Call |

| 2/25/11 | $475 | Premier House Call |
|---------|------|--------------------|
| 2/26/11 | $400 | NYHouseCallDoctor |
| 2/28/11 | $2,200 | Premier House Call |
| 2/28/11 | $5,000 | Premier House Call |
| 3/1/11 | $775 | Premier House Call |
| 3/1/11 | $775 | Premier House Call |
| **TOTAL** | **$37,600** | |

Id. [6]

The Debtor also paid for her medical care with checks.  While many of the

checks were made payable to the specific doctor who treated her, sometimes the

checks were made payable to cash and given to the doctor pursuant to his request.  HT

3/21/13 at 70-73.  A review of the checks made payable to cash in Exhibit P-1 reveals

that all but four of the checks were signed or initialed for deposit by one of the Debtor's

doctors or Andrea Poulos, Dr. Gruener's girlfriend. The four checks which cannot be

accounted for in this way total $12,300.  They include: (I) check #1478, on a Vist Bank

account ending in 73, dated 6/3/10, for $5,000; (ii) check # 396, on a Vist Bank account

ending in 22, for $5,000; (iii) check #108, on a Wells Fargo account ending 75, dated

2/4/11 for $100; and (iv) check #212, on the same Wells Fargo account ending 75,

dated 6/11/11, for $2,200.  Exhibit P-1, Document Nos. 459, 525, 791 & 1369.

According to the Debtor, she also paid for her medical treatment in cash.  HT

3/21 at 59.  The Debtor testified that when she paid the doctors with cash, she would

write down how many times the doctor came, what he did and what he charged her

each time.  Id. at 59, 161.  However, the Debtor's counsel did not submit the written

---

[6]  The Debtor also alleged that Dr. Gruener charged $2,678 for airline tickets for
himself and his girlfriend, Adrea Poulos, to her American Express account without her
permission.  HT 3/21 at 52-53.

receipts as trial exhibits and the Debtor did not bring them with her to the trial.[7]   See Id.

at 161; Defendant's Trial Exhibits.

The Debtor further testified that, sometimes, the doctors wanted to be paid for

their services with her personal possessions.  The Debtor testified that, on one

occasion, Dr. Barlow requested her brand new iPad as payment for his services. HT

3/21 at 119.  She also testified that Dr. Greuner took an expensive watch and an

expensive pocketbook in exchange for his services.  Id.

### Counter Withdrawals

During the year prior to her bankruptcy filing, the evidentiary record shows that

the Debtor made a slew of counter withdrawals from her bank accounts.  For example,

in February of 2010, there were counter withdrawals of $23,000 from a Wachovia bank

account, ending in 72, which the Debtor co-owned with Mr. Henricks. Exhibit P-1,

Document No. 1517; HT 3/25 at 22-23.  The Debtor testified that the money went to

medical bills.  HT 3/21 at 85.  On June 9, 2010, there was a counter withdrawal of

$12,000 from the same account.  Exhibit P-1, Document No. 1509.  When asked where

---

[7]  The Debtor testified that she had only come across the receipts a day or two
before the trial. HT 3/21 at 161.  Given the gravity of the matter at issue, namely
whether the Debtor will receive a discharge in her bankruptcy case, it seems
incredulous that the Debtor's counsel would not have asked the Debtor to search for
every single written note, receipt, etc., which she had that related to her cash payments
to doctors, *long* before the day of the trial.  If her counsel failed to ask for such
documentation, then he bears blame for failing to do so.  However, even if the Debtor
discovered the "receipts" a day or two before the trial, she should have provided them
to her counsel.  Perhaps, she provided the "receipts" to her counsel and he concluded
that they were not helpful to her defense.  Whatever the case, no "receipts" or other
documentation were produced or entered into evidence at the trial to support the
Debtor's testimony that she used the cash to pay for her medical care.

this money went, the Debtor testified: "I don't know." HT 3/21 at 84.  In October of

2010, the Debtor made counter withdrawals totaling $30,000 from the same account at

Wachovia.  Exhibit P-1, Document No. 1495.  The Debtor testified that she spent this

money on medical care.  HT 3/21 at 83.  On November 17, 2010, the Debtor made a

counter withdrawal for $15,000 from the same bank account.  Exhibit P-1, Document

No. 1491; HT 3/21 at 82-83.  When asked where this money went, the Debtor told the

UST that she could not tell him where it went by glancing at the bank statement.  HT

3/21 at 82-83.

On May 27, 2011, there is a cash withdrawal of $5,600 from the Debtor's

account at Wachovia ending in 75.  HT 3/21 at 68; Exhibit P-1, Document No. 414.

When asked where "that money went," the Debtor testified again that she did not know.

HT 3/21 at 68.  In June of 2011, the Debtor withdrew approximately $7,600 from the

same account.  Id. at 65; Exhibit P-1, Document No. 409.  This time, the Debtor testified

that the money went to pay medical bills.

The counter withdrawals specifically noted above total $93,200.  There are no

documents in the record to corroborate or support the Debtor's testimony that some of

this money was used to pay medical bills or for medical care.

### The Debtor's Expenditures

In 2010 and 2011, the Debtor made extensive purchases of clothing, jewelry and

other items.  She charged these purchases on her American Express account. For

example, on January 21, 2010, she purchased clothing for $817 at Nieman Marcus in the

King of Prussia mall. Joint Exhibit 22, Document No. 12.  On January 28, 2010, she

purchased food for $61.47 and clothing for $316.00 at Nieman Marcus. Id.  On April 23,

2010, she purchased a bracelet at Cartier for $3,365.50.[8]  Joint Exhibit 22, Document No.

39.  On May 20, 2010, she purchased clothing at Donna Karan for $658.16.  Joint Exhibit

22, Document No. 48.  The next day, she purchased clothing and/or accessories at Gucci

totaling $1,479.00.  Id.  On July 25, 2010, she spent a total of $1,425.67 at Sears Roebuck

at the King of Prussia mall.  Joint Exhibit 22, Document No. 68.  On July 27, 2010, she

spent $113.95 at Wayne Sporting Goods and $228.96 at Citrus Salon & Day Spa.  Id.  On

July 28, 2010, she spent $792.35 at Nieman Marcus.  Id.  On September 23, 2010, she

spent $1,637.75 at Bergdorf Goodman and $1,171.09 on men's/women's clothing at

Barney's in New York City.  Id., Document No. 87.  On the same day, she spent $122.25

at 3 Guys Restaurant in New York City.  Id.  These kinds of purchases of clothing, jewelry

and food go on and on and on.  During the trial, the Debtor testified that her purchases of

clothing and jewelry were not only for herself.  When asked who they were for, the Debtor

answered:

> I have a disabled uncle, who's eighty-some years old.  He
> doesn't have legs.  I shop for him.  I have a disabled aunt,
> who's eight-some years old, with no children, no family.  I shop
> for her.  I shop for my elderly parents.  And being part – my
> sister's personal assistant, and we are twins, when I found
> something that I liked, that I thought she would like, I would
> pick two of them up.
>
> * * *
>
> [I]f you got a further breakdown of this, you would find that

---

[8] The Debtor testified that she purchased the Cartier bracelet for her mother and
that, when her mother lost it, she purchased her another one.  HT 3/21 at 47.  The
Debtor also testified that she purchased the same bracelet for her sister but in a
different size.  Id. at 47-48.

some of the clothes are for men.  My uncle's an overweight, short man.  You would find that.  You would find clothing for a woman sized twelve, which is my mother.  And you would find some children's things, Juicy Couture, for my niece.  I, basically, somehow became the shopper for the family, because I had time on my hands.

HT 3/21 at 39.

The first point of this evidence is that the Debtor's addiction to Demerol clearly did not prevent her from leaving her home, on numerous occasions, to go shopping and dine out at restaurants.  The second point is that the Debtor's testimony reveals that, during the course of her addiction, the Debtor had the competency, memory, and ability to shop for relatives of different sizes and genders.

### The Debtor's Ability to Transact her Personal Business

During her addiction, the Debtor was obviously capable of writing out checks and making withdrawals from her bank accounts.  In addition, the Debtor testified that she diligently made payments herself on her American Express bills.[9]  Id. at 51, 160-61.

### The Debtors' Educational and Employment/Business History

The Debtor graduated from high school in 1985. HT 3/21 at 5.  Thereafter, she completed the equivalent of an associate's degree and attended Ursinus College for a few semesters.  Id.  The Debtor subsequently became employed by Wyeth Laboratories as an administrative assistant in the executive suite.  Id..

---

[9]  The Debtor further testified that she believed that, three months before she filed for bankruptcy, she made an "eighty some thousand dollar payment" on her American Express account.  HT 3/21 at 138, 159-60.  The Debtor failed to list any payments to creditors in response to Item No. 3 on her original or Amended SOFA.  See Exhibit J-14.

At some point, the Debtor stopped working at Wyeth Laboratories and became involved in residential real estate development.  HT 3/21 at 106-107.  While the Debtor's real estate ventures primarily focused on the acquisition and development of single family units, she eventually became involved in a multi-unit residential real estate development project ("Development Project") in West Norriton Township, Montgomery County, Pennsylvania, with an individual named Robert Blue ("Blue").  HT 3/21 at 108. The Development Project was not successful because: (I) disputes arose between the Debtor and Blue; and (ii) the economy had a significant downturn.

### The Events Precipitating the Debtor's Bankruptcy Filing

In 2010, the Debtor commenced litigation against Blue in state court based on their disputes concerning the Development Project. On December 23, 2010, the primary lender on the Development Project, Vist Bank, confessed judgments against the Debtor and Blue in state court in two civil actions.  HT 3/21 at 104; Bankruptcy Case, Docket Entry #39.  In these actions, Vist Bank obtained judgments against both the Debtor and Blue for approximately $640,000 and $690,000. HT 3/21 at 104; Bankruptcy Case, Docket Entry #39.  When the Debtor became aware of the Vist Bank judgments against her, she knew that she was going to have to file for bankruptcy because she was unable to pay her bills and expenses.  HT 3/21 at 103-04.

### The Commencement of the Debtor's Bankruptcy Case, The Filing of her Schedules and Statements of Financial Affairs and the Meeting of Creditors

On August 15, 2011, the Debtor filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code.  Joint Pre-Trial Statement ("Statement") ¶ 1.  On

August 16, 2011, Gary F. Seitz was appointed as the Chapter 7 Trustee.  Bankruptcy

Case,[10] Docket Entry No. 5.

On August 29, 2013, the Debtor filed her original Schedules A through J, SOFA,

and Summary of Schedules.  Statement ¶ 4. Debtor's original Schedules disclosed, in

pertinent part: (I) that the Debtor had no income or expenses; and (ii) that she had no

bank accounts.  Id. ¶ 9.  Her original SOFA indicated that she had no income for 2011,

that her income for 2009 and 2010 was unknown, and that she had no transfers within

two years prior to her bankruptcy filing.  Id.

On September 13, 2013, the Debtor filed an Amended Schedule A, an Amended

Schedule B, an Amended Schedule J, and an Amended SOFA. Id. ¶ 5.  Debtor's

Amended Schedules B disclosed that the Debtor had an interest in six bank accounts.[11]

---

[10]  Bankruptcy Case refers to the Debtor's bankruptcy case, Case No. 11-16408.

[11]  The six bank accounts which are listed on Debtor's amended Schedule B are
the following:

     (1)     checking account at Wells Fargo with a
               balance of 45 cents;

     (2)     50% interest with a non-relative in a Wells
               Fargo checking account with a balance of
               $50.00;

     (3)     savings account at Benchmark Federal Credit
               with a balance of $1,548.92;

     (4)     checking account at Benchmark Federal Credit
               with a balance of $10.00;

     (5)     50% interest with a non-relative in a VIST Bank
               checking account with a balance of $67.49;
               and

(continued...)

Id. ¶10.  Debtor's Amended Schedule J shows that she had monthly expenses of

$3,100.[12]   Debtor's amended SOFA indicates that she (I) had no income for 2009,

2010 and 2011; (ii) made no transfers within two years of her bankruptcy filing;

(iii) made no payments exceeding $600 to creditors within the 90 day period preceding

her bankruptcy filing; and (iv) closed no bank accounts within the one year period prior

to her bankruptcy filing.  See Bankruptcy Case, Docket Entry No. 26 (Item Nos. 1, 3, 10

and 11).

The Debtor testified that she was very sick and heavily medicated when her

original and amended Schedules and SOFAs were prepared and filed.  HT 3/21 at 8,

16, 19, 130.  She also testified that she continued having dependency issues after her

bankruptcy filing.  Id. at 146.  However, Mr. Henricks, who was with the Debtor when

she reviewed and signed the Schedules, specifically testified that Debtor "was of sound

mind at the time."  Hearing Transcript, dated 3/25/13 ("HT 3/25") at 47.  When asked

whether the Debtor was cognizant of what she was doing and had an understanding of

what she was signing at the time, Mr. Henricks stated: "Absolutely.  She was extremely

embarrassed about what had happened."  Id. at 47.

On September 15, 2013, the Chapter 7 Trustee conducted a § 341 meeting of

---

[11](...continued)
>   (6)   a 50% interest with a non-relative in a VIST
>         Bank checking account with a balance of
>         $202.18.

See Joint Exhibit 7, Document No. 1789.

[12]   During the trial, the Debtor testified that the amount of her monthly medical
expenses on her Amended Schedule J was grossly underestimated.  HT 3/21 at 144-
45.

15

creditors.  Id. ¶ 6. At the meeting, the Debtor testified that: (I) the title for property

located at 790 Cathcart Road ("Cathcart Property") was originally put in her name and

Mr. Henricks'  name but she signed the title over solely to him on October 23, 2009;

and (ii) she formerly owned property located at 87 E. Butler Avenue ("Butler Property")

which she sold on May 19, 2011.[13]  Id. ¶ 11. HT 3/21 at 122-127, 130.  Her counsel

---

[13]  The following colloquy occurred at trial between the Debtor and her counsel
when he asked her whether the Butler Property had been listed on her original or
amended Schedules prior to the meeting of creditors on October 31, 2011:

> Q:    Okay.  Now, was - - at the time of the meeting of
>        creditors, you had your original schedules and some
>        amendments filed, was the Butler Pike property, that
>        was in your name up to May 11, 2011, on the
>        schedules?
>
> A.    I don't think it was.  I think that was the issue
>        that we came across.
>
> Q.    Right.
>
> A.    And had to amend it.
>
> Q.    Okay.  Did you forget about it at that point – up
>        to that point?
>
> A.    I think maybe I told you and you forgot about it.
>        Sorry but I think that's what happened.
>
> Q.    Okay.
>
> A.    And maybe when I was reviewing it I didn't see
>        it because I was ill.

HT 3/21 at 121-22.  This testimony establishes that the Debtor was sufficiently lucid and
competent, despite her addiction, to provide specific information to her counsel about
the Butler Property in or about August to November of 2011 and to recognize that he
failed to include the information on her original and amended Schedules as he should
have.  The Debtor's recollection that she provided her counsel with information

(continued...)

presented a HUD-1 Settlement Statement for the Butler Property, dated May 19, 2011.

Id.  Based on her testimony, the Debtor was asked to provide additional documentary

information regarding her assets and reported transfers.  Id.  She also was asked to file

amendments to Schedules A, B, D and F, and to file a correct answer to question 10 of

her Amended Statement of Financial Affairs.  Id.

On November 9, 2011, the Debtor filed a Second Amended Schedule A, Second

Amended Schedule B, Amended Schedule C, Amended Schedules D, E and F, and a

Second Amended SOFA.  Id. ¶ 7.  While the Second Amended SOFA disclosed a

transfer of the Cathcart Property on October 23, 2009, it still failed to list the transfer of

the Butler Property. Id. ¶ 12.  To date, the Debtor's SOFA has not been amended to

disclose the transfer of the Butler Property or list any closed bank accounts.

***The Commencement of this Adversary Proceeding***

On March 30, 2012, the UST commenced the instant adversary proceeding by

filing a complaint. The Debtor filed her answer to the complaint.  On January 4, 2013,

the parties filed their Joint Pre-Trial Statement.  Docket Entry No. 14.  The trial of this

matter was held over the course of two days on March 21, 2013 and March 25, 2013.

On March 29, 2013, the Debtor filed a Motion to Reopen the Trial Record to Permit

Admission of Additional Documents.  Docket Entry No.  29.  The Motion was orally

denied by the Court during a telephone conference to address the same.  The

---

[13](...continued)
regarding the Butler Property prior to the meetings of creditors is supported by Mr.
Henricks who testified that, at the Debtor's initial consultation with the Debtor, she
provided her counsel with documents regarding the Butler Property, including the HUD
Settlement Statement.  HT 3/25 at 44.

documents which the Debtor sought to have admitted into evidence were available to her and, consequently, to her counsel prior to the conclusion of the trial.

### Accounts Not Listed on Debtor's Original or Amended Schedules or Statements of Financial Affairs

At the trial, the UST questioned the Debtor regarding several bank accounts which, he asserted, she failed to list on her original or amended Schedules or SOFAs. For example, the UST questioned the Debtor regarding a bank account at Vist Bank ending in 22. The Debtor wrote checks from this account, for example, payable to: (I) Nationwide for $2,087 on March 1, 2010, (ii) cash for $1,200 on November 21, 2010; (iii) cash for $5,000 on November 22, 2010; (iv) Dr. Keeley for $300 on November 22, 2010; and (iv) cash for $3,400 on December 6, 2010. HT 3/21 at 78-80. Exhibit P-1, Document Nos. 721, 789-791 & 810. According to Mr. Henricks, the Debtor closed this bank account by February of 2011. Exhibit D-2, Document No. 0186. The Debtor testified that she had "no idea" why the account was not listed on her Schedules or SOFAs. Id. at 80.

The Trustee also questioned the Debtor about an account at Wachovia ending in 72, which she jointly owned with Mr. Henricks. HT 3/21 at 82-85; see also Exhibit P-1, Document No. 1471. Substantial deposits were made into the account. See e.g., Exhibit P-1 Document Nos. 1495 (deposit of $70,040.55 in October of 2010), 1509 (deposit of $48,000 on June 7, 2010) & 1523 (deposit of $75,000 on 1/4). On November 19, 2010, the account had a balance of $25,437.77. Id., Document No. 1487. On December 7, 2010, there were two counter withdrawals from the account; one was for $10,000 and the other was for $14,000. Id. The Debtor testified that the

18

money was used to pay her medical care or her American Express credit card bills.   HT 3/21/13 at 82.   On 5/20/11, the balance of the account was zero.   According to Mr. Henricks, the Wachovia account ending in 72 was closed by February of 2011.   Exhibit D-2, Document No. 186. The account is not listed on the Debtor's original or amended SOFAs.

In addition, the UST questioned the Debtor regarding an account which she had at Vist Bank ending in 73.   HT 3/21 at 89-90.   On May 10, 2011, the account had a balance of $1,580.   See Exhibit P-1, Document No. 1409.   The account was closed before the Debtor filed her bankruptcy case, see Exhibit D-2, Document No. 0186; however, the account is not listed on the Debtor's original or amended SOFAs.   When asked for a reason, the Debtor testified that she did not know.   HT 3/21 at 90.

**The Cathcart Property**

According to the Debtor, the Cathcart Property was purchased in 2004.   Id. at 122-123. Title to the property was transferred to her and Mr. Henricks.   HT 3/25 at 31.   The Debtor testified that she never invested any money in acquiring or improving the property.[14]   HT 3/21 at 18-19, 123.   The title was eventually transferred, for no consideration, solely to Mr. Henricks.   Id.

**The Butler Property**

The Butler Property was a rental property that the Debtor purchased "a few years back[.]" HT 3/21 at 25.   The Debtor renovated the property and then rented it out.   Id. In

---

[14]   Mr. Henricks also testified that the Debtor did not put up any funds for the acquisition or improvement of the Cathcart Property.   HT 3/25 at 31-32.

February of 2010, the Debtor agreed to sell the Butler Property to her sister and

Henricks for $100,000 plus payment of the outstanding mortgage balance on the

property and payment of the fees/costs associated with the transaction.  Id. at 123-127;

HT 3/25 at 40-41. As noted above, the $100,000 was paid to the Debtor in February of

2010 and deposited into one of her accounts.  See Exhibit P-1, Document No. 1517

(showing transfer of $100,000 into one of Debtor's bank accounts).  However, because

of a problem involving the title, the closing on the sale did not occur until May 19, 2011.

At that time, the Debtor's sister and Henricks purchased the property under the name of

Carhen Enterprises, LLC., for a total of $304,056.60.  HT 3/21 at 123-27; HT 3/25 at

48..  See also Exhibit J-9 (HUD Settlement Statement).

### III.  DISCUSSION

### A.  Law Regarding Section 727(a)(3)

Section 727(a)(3) provides:

(a) The court shall grant the debtor a discharge, unless--

* * *

(3) the debtor has concealed, destroyed, mutilated,
falsified, or failed to keep or preserve any recorded
information, including books, documents, records, and
papers, from which the debtor's financial condition or
business transactions might be ascertained, unless such act
or failure to act was justified under all of the circumstances
of the case;

11 U.S.C. § 727(a)(3).  The purpose of § 727(a)(3) is to insure that the debtor provides

the trustee and his or her creditors with sufficient information to "ascertain the debtor's

financial condition and track his financial dealings with substantial completeness and

20

accuracy for a reasonable period past to present.'" In re Juzwiak, 89 F.3d 424, 427 (7th

Cir. 1996) (quoting Bay State Milling Company v. Martin (In re Martin), 141 B.R. 986,

995 (Bankr.N.D.Ill.1992)). "It also ensures that 'creditors are supplied with dependable

information on which they can rely in tracing a debtor's financial history.'" Holber v.

Jacobs (In re Jacobs), 381 B.R. 147, 166 (Bankr. E.D. Pa. 2008) (quoting Meridian Bank

v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992)). See also DeAngelis v. Von Kiel (In re

Von Kiel), 461 B.R. 323, 335 (Bankr. E.D. Pa. 2012) (quoting Gray v. Jackson (In re

Jackson), 453 B.R. 789, 796 (Bankr. E.D. Pa. 2011)) ("'As a precondition to the

bankruptcy discharge, § 727(a)(3) requires a debtor to produce information for

creditors to determine and track the debtor's financial . . . transactions for a reasonable

time prior to bankruptcy.")

The Third Circuit's two-fold test for § 727(a)(3) is the following: (1) did the

debtor fail to maintain and preserve adequate records; and, if so (2) did the failure

make it impossible for the plaintiff to ascertain the debtor's financial condition for a

reasonable period past to present. See Roodhof v. Roodhof, ___ B.R. ___, 2013 WL

1953182, at *6 (Bankr. M.D. Pa. May 13, 2013) (citing Meridian Bank v. Alten, 958 F.2d

1226, 1230 (3d Cir.1992)). Importantly, § 727(a)(3) "does not require any showing of

intent." In re Jou v. Adalian (Adalian), 474 B.R. 150, 164 (Bankr. M.D. Pa. 2012); see

also Wachovia Bank v. Spitko (In re Spitko), 357 B.R. 272, 305 (Bankr. E.D. Pa. 2006)

(no intent to defraud is required under § 727(a)(3).

If the plaintiff proves both prongs of the aforementioned test by a

preponderance of the evidence, Haupt v. Belonzi (In re Belonzi), 476 B.R. 899, 904

(Bankr. W.D. Pa. 2012), then the debtor must justify his/her failure to maintain and

preserve adequate records under the circumstances, Haupt v. Belonzi (In re Belonzi),

476 B.R. 899, 904 (Bankr. W.D. Pa. 2012).  Some of the factors the court should

consider when analyzing the sufficiency of debtor's justification include: (1) debtor's

education; (2) debtor's sophistication; (3) volume of debtor's business; (4) complexity

of debtor's business; (5) amount of credit extended to debtor in his business; (6) any

other circumstances that should be noted in the interest of justice.  Roodhof v.

Roodhof, ___ B.R. ___, 2013 WL 1953182, at *6 (Bankr. M.D. Pa. May 13, 2013) (citing

Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir.1992)).

"Creditors are not required to risk having the debtor withhold or conceal assets

'under cover of a chaotic or incomplete set of books or records.'" Meridian Bank v.

Alten, 958 F.2d 1226, 1230 (3d Cir. 1992) (quoting  Cox v. Lansdowne (In re Cox), 904

F.2d 1399, 1401 (9th Cir. 1990)).  In Sherwood Fine Art, Inc. v. Burrik (In re Burrik),

459 B.R. 881 (Bankr. W.D. Pa. 2011), the bankruptcy court aptly stated:

> Several important points should be made regarding the
> adequacy of a debtor's records. First, "said records may be
> neither (a) 'chaotic or incomplete,' (b) in such a condition
> that a creditor is 'required to speculate as to the financial
> history or condition of the debtor,' nor © in such a condition
> that a 'creditor [is compelled] to organize and reconstruct
> the debtor's business affairs.' " In re Buzzelli, 246 B.R. 75,
> 96 (Bankr. W.D. Pa. 2000) (internal citations omitted).
> Second, "[o]ral testimony is not a valid substitute or
> supplement for concrete written records," In re Juzwiak, 89
> F.3d 424, 429–30 (7th Cir. 1996), which means that records
> are inadequate if gaps therein exist that can only be filled by

> the oral testimony of a debtor, see Buzzelli, 246 B.R. at 97.
> Third, a debtor's records must be such that " '[c]reditors ...
> [need] not be forced to undertake an independent
> investigation of a debtor's affairs.' " Juzwiak, 89 F.3d at 429;
> Buzzelli, 246 B.R. at 96–97 (quoting Juzwiak ).

459 B.R. at 890.  See also In re Juzwiak, 89 F.3d 424, 428 (7th Cir. 1996) ("[C]ourts and

creditors should not be required to speculate as to the financial history or condition of

the debtor, nor should they be compelled to reconstruct the debtor's affairs.");

Wachovia Bank v. Spitko (In re Spitko), 357 B.R. 272, 305 (Bankr. E.D. Pa. 2006)

(noting that a debtor must provide sufficient written evidence, from which his present

financial condition as well as his financial condition for a reasonable period in the past,

may be ascertained and that a debtor cannot require the trustee or his creditors to

reconstruct his affairs).

## B.  Application of Law to the Facts

The UST proved at trial that the Debtor failed to keep records with regard to

numerous and substantial counter withdrawals from her bank accounts.  The UST

specifically questioned the Debtor regarding counter withdrawals totaling $93,200.00

The Debtor vaguely testified that she either did not know where the money went or

that it was used to pay medical bills or for medical care.  Even as to the Debtor's

testimony that the counter withdrawals were used to pay medical bills or for medical

care, there is no documentary evidence in the record to corroborate or support the

Debtor's testimony.  The Debtor's indefinite testimony fails to establish how the money

was used.

The UST also presented documentary evidence of checks made payable to cash. As noted above, four of the checks, totaling $12,300, contain no indication of how the cash from them was used.  The Debtor's testimony provides no insight on the issue and there is no documentation in the record which helps explain the use of the funds.

Based on the Debtor's personal, employment and business background, the Debtor is clearly sufficiently sophisticated and experienced in financial matters.  For example, she acquired and renovated the Butler Property for which she charged and received rental payments and "triple net" fees for expenses outside of rent.  HT 3/21 at 55.

The Debtor's justification for not having records to explain the use of the cash from the counter withdrawals and the four checks (totaling $12,300) is that she was addicted to prescription medication, namely Demerol.  Based on the evidence, the Court finds it credible that the Debtor suffered from an addiction; however, she provided no expert testimony regarding the effect which Demerol or an addiction thereto has on a person's ability to create and  maintain records or, more specifically, the effect which Demerol had on her ability to keep and maintain records.    It is likely that when the Debtor was only moderately or mildly addicted to Demerol, she was capable of keeping and preserving records but perhaps, as her addiction worsened or when it was at its worst, she became or was incapable of doing so.  Unfortunately, the Court cannot draw such conclusions because the Debtor failed to provide any expert evidence or sufficiently specific evidence on the matter.

On the other hand, the record reveals that, during the Debtor's addiction, she was competent and capable of shopping for clothing and accessories for herself as well as for several relatives of different sizes and gender. In addition, the Debtor testified that she specifically recalled telling her counsel about the transfer of the Butler Property and that he mistakenly failed to include it on her amended SOFA. The record also shows that the Debtor wrote out numerous checks over the course of time to pay her bills and she specifically testified that she diligently paid her American Express bill by herself. Most telling, however, is the Debtor's testimony that she kept detailed written records of her doctor's visits when she paid them in cash; yet, no such records were produced or offered into evidence at the trial. The Court can only conclude that if such records were kept and maintained, they do not support the Debtor's defense.

Based on this backdrop of evidence, the Court concludes that the Debtor has failed to establish that her addiction to Demerol provides justification for her failure to keep or produce records which would enable the UST and her creditors to ascertain her financial condition during the period of time leading up to and around her bankruptcy filing. The Debtor had substantial amounts of cash flowing into her bank accounts and substantial amounts of cash being taken out of them via counter withdrawals and by checks made payable to cash. The UST and her creditors have the right to know where the cash went. "[O]btaining a discharge 'is not an absolute right, but rather a privilege accorded to honest debtors who conduct their financial affairs with honesty and openness." In re Kantorik, 475 B.R. 233, 239 (Bankr. W.D. Pa. 2012) (quoting The

25

Cadle Co. v Ogalin (In re Ogalin), 303 B.R. 552, 557 (Bankr. D. Conn. 2004)).

## IV.  SUMMARY

The Debtor is not entitled to a discharge under Chapter 7 of the Bankruptcy

Code because she unjustifiably failed to keep records or information from which her

financial condition might be ascertained.  Therefore, she shall be denied a discharge

pursuant to 11 U.S.C. § 727(a)(3).

An Order consistent with this Memorandum Opinion shall be issued.


DATED: September 30, 2013.                    _____
                                              HONORABLE JEAN K. FITZSIMON
                                              United States Bankruptcy Judge



Copies to:

**Plaintiff's Counsel**
George Conway, Esquire
Office of the U.S. Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

**Defendant's Counsel**
Paul J. Winterhalter, Esquire
1717 Arch Street, Suite 4110
Philadelphia, PA 19103

**Courtroom Deputy**
Ms. Joan Ranieri